**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**UNITED STATES OF AMERICA,**

    **Petitioner**

    **v.**

                             **Crim. No. 17-582 (ADC)**

**RICARDO LOPEZ-TORRES,**

    **Defendant.**

## OPINION AND ORDER

Pending before the Court is defendant Ricardo López-Torres's ("defendant") motion to suppress, **ECF Nos. 25**, 27 United States Magistrate Judge Marshall D. Morgan's Report and Recommendation ("R&R"), **ECF No. 74**, defendant's objections thereto. **ECF No. 76**, and a response from the government, **ECF No. 77**.

For the following reasons, the Court hereby **OVERRULES** defendant's objections to the R&R, **ECF No. 76**, and hereby **ADOPTS** the R&R, **ECF No. 74**. Consequently, the Court hereby **DENIES** defendant's motion to suppress, **ECF Nos. 25, 27**.

**I.**     **Procedural Background**

    **A.**     **Charge against defendant and the motion to suppress**

On November 9, 2017, a grand jury returned a one-count Indictment against defendant. Defendant was charged with a violation of 18 U.S.C. sec. 922(g)(1) for being a felon in possession

of firearms and ammunition. A Superseding Indictment was returned on October 24, 2019 to include language pertaining "knowledge" to the charge and adding a firearm forfeiture claim. **ECF No. 50**.

On April 24, 2019, defendant, through counsel, filed a motion to suppress physical evidence seized during a warrantless search of defendant's home that took place on the day of his arrest, on October 27, 2017. **ECF No. 25**.[1] The government opposed. **ECF Nos. 29, 46**. Defendant's motion to suppress and related filing were referred to the Magistrate Judge for an evidentiary hearing and a report and recommendation. **ECF No. 48**. An evidentiary hearing was held on February 4, 2020. **ECF No. 58**. The government called four witnesses from the Police of Puerto Rico Department ("PRPD"). To wit, Agent Roynashmil Rodríguez-Martínez ("Agent Rodríguez-Martínez"), Sergeant Luis Pacheco-Albizu ("Sergeant Pacheco-Albizu"), Officer Yomaira Marrero-Chévere ("Officer Marrero-Chévere"), and Agent David Nieves ("Agent Nieves"). Defendant did not call any witness on his behalf.

Due to certain arguments raised by the defense during the evidentiary hearing (*i.e.* regarding errors in the meta data or time stamps of photographs submitted by the government as evidence), the Magistrate Judge granted defendant an opportunity to call witnesses on this issue. Nevertheless, on March 6, 2020, defendant informed he would not present any witnesses

---

[1] Defendant amended his motion to suppress on June 1, 2018. **ECF No. 27**.

to challenge the apparent metadata error in the photographs. **ECF No. 64**. Post-hearing briefs

ensued. **ECF Nos. 70, 71**.

The Magistrate Judge issued a well-rounded, comprehensive R&R recommending the

denial of defendant's motion to suppress. **ECF No. 74**. Defendant logged objections to the R&R,

**ECF No. 76**, and the government responded, **ECF No. 77.**

## II.    Legal standard

The District Court may refer pending criminal motions to a Magistrate Judge for entry of

a report and recommendation. 28 U.S.C. §636(b)(1)(A); Fed. R. Crim. P. 59(b)(1). An adversely

affected party may file written objections to the report and recommendation within fourteen

days after being served with the same. 28 U.S.C. §636(b)(1)(C).  A party is entitled to a *de novo*

review of "those portions of the report . . . to which specific objection is made."  *Sylva v. Culebra*

*Dive Shop*, 389 F.Supp. 2d 189, 191-92 (D.P.R. 2005) (citing *United States v. Raddatz*, 447 U.S. 667

(1980)).

"Absent objection by [the adversely affected party], [a] district court ha[s] a right to

assume that [the affected party] agrees to the magistrate's recommendation." *M. v. Falmouth Sch.*

*Dep't*, 847 F.3d 19, 25 (1st Cir. 2017) (citing *Templeman v. Chris Craft Corp.*, 770 F.2d 245, 247 (1st

Cir. 1985), cert. denied, 474 U.S. 1021 (1985)). Thus, "a party's failure to assert a specific objection

to a report and recommendation irretrievably waives any right to review by the district court

and the court of appeals." *Santiago v. Canon U.S.A., Inc.*, 138 F.3d 1, 4 (1st Cir. 1998).

## III.    Discussion

### A.    Defendant's objections to the R&R

Defendant objects and takes issue with the fact that the Magistrate Judge deemed credible the testimony of the four government witnesses. **ECF No. 76** at 2-5. His only argument, however, is that the metadata of 32 photographs[2] (of the search of his residence) submitted by the government during the evidentiary hearing include a time stamp that is inconsistent with the timeline established by all four PRPD officers who testified. *Id.*, at 3-5. Specifically, the metadata indicates the 32 photographs were taken between 7:56 to 8:43 a.m., while all the witnesses agreed the arrest and search occurred around 10:00 -11:00 a.m. Defendant further objects to the Magistrate Judge's interpretation of *United States v. Mercedes-Abreu*, **Crim. No. 18-006 (ADC)**, 2020 WL 1030727, at 3 (D.P.R. February 28, 2020), and sustains that the Court should discredit the government witnesses and suppress the seized evidence pursuant to the Opinion and Order in *United States v. Mercedes-Abreu*. *Id.*, at 5. Moreover, defendant argues that his wife's consent to search the house was not voluntary. *Id.*, at 5-6. Finally, defendant argues that the exigent circumstances exception to unlawful search and seizures is not applicable. *Id.*, at 6.

### B.    Rehashing arguments

While true that the Court must make a *de novo* determination as to specific objections to portions of the R&R, 28 U.S.C.A. § 636(b)(1)(C), it need not apply such standard when faced with

---

[2] *See* **ECF No. 69-1**, *Defendant's Composite Exhibit A-1.*

"frivolous, conclusive, or general objections." *Vega-Feliciano v. Doctors' Center Hosp., Inc.*, 100 F. Supp. 3d 113, 116 (D.P.R. 2015). "[T]he district court should be spared the chore of traversing ground already plowed by the Magistrate [Judge]." *United States v. Morales-Castro*, 947 F. Supp. 2d 166, 170-171 (D.P.R. 2013) (citing *González-Ramos v. Empresas Berríos, Inc.*, 360 F.Supp.2d 373, 376 (D.P.R. 2005)). Lacking a proper objection, the Court "needs only satisfy itself that there is no plain error on the face of the record" in order to adopt the magistrate judge's findings. *López-Mulero v. Vélez-Colón*, 490 F. Supp. 2d 214, 217-218 (D.P.R. 2007); *see also Pabón-Mandrell v. United States*, 91 F. Supp. 3d 198, 201 (D.P.R. 2015) (*de novo* review unwarranted where objections are repetitive of the arguments already raised before the magistrate judge); see also *Cruz-Berríos v. Borrero*, CV 14-1232 (ADC), 2019 WL 4780776, at *3 (D.P.R. Sept. 30, 2019), *amended in part*, CV 14-1232 (ADC), 2020 WL 12814753 (D.P.R. Mar. 30, 2020).

As a threshold matter, the Court notes that defendant's objections are nothing but a repetition of the same exact arguments he raised before the Magistrate Judge and that were meticulously addressed by the Magistrate Judge in the R&R. *See* **ECF No. 74.**

For example, defendant ignores that "the Court has already found that the police had two bases of probable cause to arrest the defendant, one for his alleged involvement in the triple homicide at the pizzeria, and the other for being a felon in possession. And it is precisely the defendant's possession of the firearm that also creates the exigency for the officers to enter his house." *Id.* at 18. Defendant similarly restates his first contention that the metadata associated

with the 32 photos taken on the day of his arrest, which appear to indicate that the photos were taken between 7:56AM and 8:43AM, prove that all the agents were lying during the suppression hearing when they testified [] that the search began at approximately 11:00AM, after Raquel had signed the Consent to Search Form… defendant claims that the discrepancy in time between the metadata and the testimony of all of the officers 'completely vitiates the notion that PRPD officers lawfully seized the evidence [ ] from Mr. López Torres' home pursuant to [a] valid consent' because it purportedly occurred prior to the police obtaining written consent from Raquel." *Id.* at 22. He further reasserts that "[*United States v. Mercedes-Abreu*, 2020 WL 1030727, *supra*] which was decided by the same district judge who presides over this case, is conclusive of the question that the time-stamp metadata on the photos taken by the forensic team the day of the defendant's arrest and the search of his home, should be summarily believed by the Court over the contradictory live testimony given by the government's four law enforcement witnesses." *Id.* at 22-23. In the alternative, defendant reasserts that, "even assuming the Court were to find, as it just did, that [Suárez-Del Valle] signed the Consent to Search Form before the agents executed the search of the defendant's residence, the search itself was still unconstitutional because the circumstances surrounding her signing of the Consent to Search Form demonstrate that it was not freely and voluntarily done." *Id.* at 38.

Even if the Court overlooked the fact that defendant simply rehashed his arguments, defendant's arguments at **ECF No. 76** are unavailing.

The Court will now address each argument in turn.

**C.      Defendant's argument**

**(i)      Credibility of the witnesses**

The Court first underscores the fact that defendant's objection to the R&R's finding of credibility hinges upon one issue and one issue alone, his understanding that an error in the photographic evidence's metadata (the time the photographs were taken) "contradicted" the testimonies of the four PRPD officers who took the stand. **ECF No. 76** at 2, 3, 4.[3]

Notably, defendant does not challenge any particular finding of fact. Instead, he simply challenges the Magistrate Judge's decision to credit the testimony of all four witnesses presented by the government over the time frames depicted on the metadata.  Other than that, all photographs taken, and the sequence in which they were taken, the areas searched as depicted do corroborate the testimony of all four law enforcement agents that remained consistent throughout direct and cross-examination. As stated before, however, "[t]he district court need not consider… conclusive, or general objections." *Rivera–García v. United States,* Civ. No. 06–1004(PG), 2008 WL 3287236, *1 (D.P.R. Aug. 7, 2008) (citing *Battle v. U.S. Parole Comm'n,* 834 F.2d 419 (5th Cir. 1987)). Even if the Court considered defendant's argument in the light most favorable to him, it would still reject it.

---

[3] "This conflict between the metadata and the [PRPD]'s testimonies is exactly the issue here." **ECF No. 76** at 3.

"Everything depends on context."[4] Accordingly, the Court will start off its analysis with a summary of the findings of facts defendant failed to object. On October 20, 2017, five people were shot in a restaurant located in Bayamón, Puerto Rico.[5] Three were killed and another two, including a baby, sustained injuries. Agent Rodríguez-Martínez was assigned to the case. Thanks to a confidential informant and surveillance footage, defendant and eight other individuals suspected of being involved in drug trafficking were identified as suspects of the shooting. The investigation revealed that defendant was in charge of handing out and collecting back the weapons used on the day of the shooting. Moreover, the investigation placed defendant inside one of the motor vehicles used to carry out the shooting, which left more than 50 bullet casings in the scene. A background check performed by the PRPD revealed that defendant had been convicted of one or more felonies and that defendant did not have a license to posses a firearm in Puerto Rico.

On October 22, 2017, while patrolling in Bayamón, another PRPD officer, Marrero-Chévere, received a radio message that there had been a shootout on Paseo A Street in "Pica Piedra," Bayamón, where defendant's residence is located.[6] Eventually, Officer Marrero-Chévere pursued the suspects fitting the description relayed on the radio and found several

---

[4] *Nikitine v. Wilmington Tr. Co.*, 715 F.3d 388, 390 (1st Cir. 2013)(C.J. Selya).

[5] Because defendant did not raise any objection against a specific factual finding, the following findings are extracted from the R&R.

[6] According to the information gathered by the PRPD, another two suspects of the October 20, 2017 triple homicide lived across the street from defendant's residence. A fourth suspect of the unfortunate events of October 20, 2017, was defendant's stepson, who resided with the defendant.

individuals. Among them, Officer Marrero-Chévere found and arrested defendant in connection with the "Paseo A Street" shootout. Due to lack of evidence at that moment connecting defendant with the "Paseo A Street" shootout, the PRPD released defendant.

PRPD Sergeant Pacheco Albizu, received authorization and planned to arrest several suspects of the October 20, 2017 massacre. A group of PRPD officers agreed to meet at a place nearby defendant's house, and around 7:00AM-8:00 a.m. some of them were instructed to conduct surveillance. Defendant was spotted sitting on the front steps of his house.

Around 10:00 a.m., a group of PRPD officers arrived at defendant's house, which is located across the street from the residence of two other suspected participants of the same shooting. Defendant was no longer in front of his house. Standing outside the house in front of the gate, PRPD officers proceeded to call defendant out. Sergeant Pacheco-Albizu and Officer Marrero-Chévere testified that they saw, (through a metallic see-through gate) the defendant approaching them. **ECF No. 67-5** at 1. Defendant was seen holding with both hands a black firearm in front of him. Still inside his house, following orders from the PRPD, defendant dropped the weapon and dropped to the floor.

> Concerned for his safety and that of the other officers, Sergeant Pacheco then gave instructions for Officer Ricardo Agrón to retrieve the breaching equipment from the trunk of Sergeant Pacheco's patrol car to forcibly open the gate. Moments later, the officers cut through the slide on the gate and gained entry to the residence. The firearm [defendant] had been holding lay on the floor to his left. See **Government Exhibits 8 and 8A**. He was immediately placed under arrest and taken outside of the house.

**ECF No. 74** at 7. Defendant's wife, Raquel Suárez-Del Valle ("Suárez-Del Valle") exited and tried to prevent PRPD officers from taking defendant away. Officer Marrero-Chévere testified that she then placed Suárez-Del Valle under arrest for obstruction of justice at 10:40a.m.[7] Suárez-Del Valle was moved to a nearby patrol car where she was advised of her *Miranda* rights. Suárez-Del Valle filled out a *Miranda* Rights form at around 10:45 a.m.

Agent Nieves testified that on October 27, 2017, at approximately 10:20-10:30 a.m., he heard that PRPD officers were in the process of arresting defendant. Agent Nieves and several other agents under his command arrived on scene at approximately 10:40 a.m. He witnessed PRPD officers escorting a woman out of the house, and he could see defendant under arrest. Agent Nieves recognized Suárez-Del Valle as a person who used to work at the McDonald's restaurant in Bayamón.[8] Agent Nieves perceived that Suárez-Del Valle was looking at him in an odd way, which he interpreted as her wanting to tell him something. After Suárez-Del Valle filled out a *Miranda* rights form, Agent Nieves asked her "if there was anything else illegal over at her home and she said, Yes [sic]." **ECF No. 74** at 9.

Suárez-Del Valle was then taken to the front porch area of the house to discuss the possibility of consenting to a search of her house. An attorney arrived on scene claiming to be counsel for Suárez-Del Valle and "screamed to her not to sign any documents." *Id.* However,

---

[7] Marrero-Chévere testified she was sure of the time because she always looks at her watch when she conducts arrests.

[8] Agent Nieves testified he recognized Suárez-Del Valle as a person he knew worked at a McDonald's restaurant in Bayamón that he used to visit and because Agent Nieves's ex-wife worked with Suárez-Del Valle.

Suárez-Del Valle said, "[l]et's go forward with it. I am the one signing this." *Id*. Suárez-Del Valle signed the Consent to Search Form. Up to this point, the witnesses described Suárez-Del Valle's state and demeanor as "completely normal." *Id*.

Immediately after Suárez-Del Valle signed the Consent to Search Form, PRPD officers requested help from the PRPD Technical Services Division to take photos of the search. Suárez-Del Valle, Agent Nieves, Officer Marrero-Chévere, and the technician began the search. An AK-47 rifle with a drum magazine and a black 9mm pistol magazine were spotted in plain sight in Suárez-Del Valle's bedroom. Upon such discovery, PRPD officers informed Suárez-Del Valle that she was under arrest for the items found inside the house.

After listening to those words, Suárez-Del Valle started to tremble and told the PRPD officers that she suffered from epilepsy. Agent Nieves asked her where she kept her medications. Although they were able to get her the pills quickly, Agent Nieves said she still suffered a strong seizure. **ECF No. 74** at 9-10. PRPD immediately halted the search at approximately 11:15 a.m. because Suárez-Del Valle "was not conscious of what was going on because of the seizure." *Id*. Paramedics arrived on scene. However, Suárez-Del Valle refused to go to the hospital.

Agent Nieves filled out a second *Miranda* rights form wherein he wrote Suárez-Del Valle's full name and age in the blanks provided, then filled in the date, "October 27, 2017," and the time, "11:10AM," indicating the approximate time they found the firearms in plain sight.

However, Agent Nieves noted that "Suárez-Del Valle refused to sign" that time around. *Id.*, at 6.

Defendant does not challenge a single fact from the R&R, summarized above. Conversely, he only questions the Magistrate Judge's reliance on the witnesses' testimony. His challenge, however, is built upon the fact that the metadata (specifically, time stamp) of the photographs taken during the search indicate that they were taken approximately three hours before the witnesses testified the search occurred. First of all, "[t]he Court generally will not disturb the credibility determinations of a magistrate judge." *U.S. v. López-Ortiz*, 648 F. Supp. 2d 241, 249 (D.P.R. 2009). In this case, after listening to all the witnesses and evaluating the evidence submitted, as well as the post-hearing briefs filed by the parties, the Magistrate Judge validly chose to credit the testimony of four law enforcement officers. The Magistrate Judge's determination was in no way, shape or form unjust to defendant. As a matter of fact, the Magistrate Judge granted defendant, the one introducing the photographs into evidence, an opportunity to present a witness (even after the evidentiary hearing) to testify about or question the metadata information. Defendant chose not to do so. [9]

The R&R's finding that the arrest and search took place on or around 10:00-11:00 a.m. is well supported by the record, which the undersigned examined carefully. For example, Officer

---

[9] The government contends that if defendant wanted the Court to credit the physical evidence over the testimonies offered by the government's witnesses, it was defendant's burden to show that such evidence was more reliable than the testimonies offered. **ECF No. 77** at 7. The government asserts it never stipulated to the accuracy of the metadata. *Id* at 8.

Marrero-Chévere testified that "at approximately 10:00 a.m." one of her "co-workers had located [defendant] and he was on the steps in front of his house." **ECF No. 60** at 88. Agent Nieves also testified that after receiving information and instructions to go to defendant's house "because they were carrying out an arrest at that moment… at approximately 10:20 until 10:30 in the morning." *Id.*, at 139. Likewise, Sergeant Luis Pacheco clarified the timeline during cross-examination by defense counsel stating "between ten and eleven in the morning, more or less." *Id.*, at 71. Moreover, Government Exhibit 16 ("Consent to Search Form") indicates that the search was conducted at "11:00 a.m.". **ECF No. 67-23** at 2. Absent any testimony or evidence to the contrary (aside from an error in the photographs' metadata), "[t]he Court sees no reason why it should tamper with these appraisals of the testimony and the witnesses heard by the magistrate judge." *U.S. v. López-Ortiz*, 648 F. Supp. 2d at 249.

Even if the Court accepted defendant's argument, the only thing that would change is the time in which the arrest and search was conducted. This wrinkle in time, however, is innocuous. To wit, holding that the arrest and search took place three hours earlier on October 27, 2017 (between 7:56 to 8:34 a.m.) would not change the fact that the only testimony or evidence shows, *inter alia*, that the PRPD: (i) analyzed footage from date the massacre took place, (ii) had information provided by a confidential informant linking and placing defendant as a participant

of the shootings,[10] (iii) knew that defendant was a felon without a license to possess a firearm,[11]

(iv) knew that defendant lived across the street from others suspected to have conspired with

him in the shootings,[12] (v) and not one but two PRPD officers saw defendant on the morning of

October 27, 2017, be that 7 a.m. or 11 a.m., in his house holding a firearm in front of him with his

two hands.[13] Contrary to the case of *Mercedes-Abreu*, the search in the case at bar was not based

on a warrant but rather on the consent.

The only reason to discredit the testimony of four law enforcement agents, defendant

argues; is the time reflected within the metadata. Were the search to have taken place three hours

prior to what the agents testified, then the witnesses were not credible. While no reasonable

explanation as to why the time reflected within the metadata was not correct or consistent with

what the agents testified, the government posited, and the Magistrate Judge found reasonable

to concede that "while the metadata time stamps on the photos do not reflect the correct time,

they do appear to depict the correct passage of time" reason for which the Magistrate Judge

concluded "that the metadata time stamps served to corroborate, rather than impeach, the

---

[10] "Q- Prior to October 27, 20217, what evidence did you have that linked [defendant] to the triple homicide…? A- I had the evidence of a cooperating witness who participated in this case. That evidence was confirmed via the surveillance cameras of that business and also via the surveillance cameras of another business." Evidentiary Hearing Transcript, **ECF No. 60** at 6.

[11] "Q- As part of your investigation, did you perform any background checks on [defendant] prior to October 27th? A- [Defendant] had previous crimes that were felonies for theft and other things but they were felonies[…] [Defendant] did not have a license to carry a gun." *Id*., at 18.

[12] "[W]e would be placing a call to the house in front of Richard's where two of the other suspects lived." *Id*., at 48.

[13] "A- When he comes out, like half of his body comes out through the doorway with what seems to be a black colored firearm in his hands. Q- How was he holding that firearm? A- With his two hands." *Id*., at 89.

government witnesses' testimony." **ECF No. 74** at 37. To so conclude, the Magistrate Judge did a meticulous analysis of the time in which each photo was taken, the sequence of events depicted, the time lapse between pictures, time in which the picture taking process began and ended. All this was compared with the sequences of events narrated by the agents while testifying. Based on the Counts review of the testimony at the hearing, we also conclude that the metadata analysis, as it relates to "the passage of time" for and during the search, lends full credibility to the testimony of the government witnesses. Ultimately, credibility issues are for the jury to determine. *U.S. v. Rosario-Pérez*, 957 F.3d 277, 291 (1st Cir. 2020).

> **(ii)** *United States v. Mercedes-Abreu*

The second part of defendant's blanket challenge related to the photographs' metadata time stamps hinges on *Unites States v. Mercedes-Abreu*, **Crim. No. 18-006, ECF No. 98**, which, according to defendant, "deals with the exact same issues" in that "the photographs were taken hours before the alleged search." **ECF No. 76** at 5. The Court disagrees, these cases are not even close.

In *United States v. Mercedes-Abreu,* the Court did find a severe discrepancy between the metadata time stamps of some photographs and the time frame in the sworn statements of the agents within the affidavit in support of the search warrant issued by a state judge. However, contrary to defendant's optimistic yet narrow reading, in *Mercedes-Abreu* the government stipulated that the time of photographs was correct. In this case, the government and the

Magistrate Judge reasonably, in light of the rest of the evidence as well as the testimony heard throughout the evidentiary hearing, concluded the time stamp that appears in the metadata of the photographs is incorrect. **ECF No. 70** at 26. Considering all evidence relevant, assignment of credibility and weight, at this juncture; remains for the Court and the ultimately, for the jury. *See Rosario-Pérez*, 957 at 291.

More importantly, *United States v. Mercedes-Abreu* sheds light on a truth that defendant seems to be unwilling to accept here: the Courts has an obligation to make "a credibility determination between stipulated photographic evidence… and [PRPD]'s testimony." *Id*., at 14-15. In that case, the Court found that PRPD Agent Pedro Medina-Negrón not only lied to the Court during the evidentiary hearing, but also lied to the state court judge in order to secure a search warrant several hours after the seized items had been moved and manipulated in order to expose their content. Moreover, the Court found PRPD Agent Pedro Medina-Negrón's version of the facts submitted to obtain a belated search warrant contradicted not only by the photographs but also by "his testimony at the evidentiary hearing." *Id*., at 27. Finally, in *United States v. Mercedes-Abreu* the Court found that PRDP Agent Pedro Medina-Negrón lied in so many aspects of his testimony that the Court considered "his behavior sufficiently egregious to warrant a perjury and/or obstruction of justice investigation." *Id*., at 28.

Contrary to the outright lies in PRDP Agent Pedro Medina-Negrón's testimony, which surfaced from his own conflictive testimony in open Court, his under-oath statement to the state

judge, and the evidence, here, aside from an apparent error in the time stamp of the photographs, defendant has not pointed to a single reason why the Court should not deem the testimony of four PRPD officers credible. In this case, the Court evaluated not one but four testimonies. Although not perfect, all four testimonies established that the arrest and search took place between 10:00-11:00 a.m., as discussed before.

Moreover, other than the time, the photographs submitted in this case corroborate and depict exactly what the witnesses proffered during their testimonies. In *United States v. Mercedes-Abreu*, beyond a discrepancy in the timeline, the photographs showed that PRDP Agent Pedro Medina-Negrón did not tell the truth about the state in which he found the objects searched and seized. To wit, in *United States v. Mercedes-Abreu* the photographs demonstrated that the seized objects were no in plain sight, as PRDP Agent Pedro Medina-Negrón purported. Instead, the photographs in *United States v. Mercedes-Abreu* evinced that the firearm and drugs were extracted from either a hiding place or objects concealing their identity and were finally displayed for purposes of documentation via photographs.

There is not a cloud of a doubt, *United States v. Mercedes-Abreu* does not suggest that the Court should alter the Magistrate Judge's finding of credibility. If anything, *United States v. Mercedes-Abreu* corroborates the fact that the Magistrate Judge correctly made "a credibility determination between stipulated photographic evidence… and [PRPD]'s testimony." *Id.*, at 14-15. In light of the totality of the record, the Court finds that the Magistrate Judge made the correct

call by crediting the testimonies of the government's witnesses, which this Court examined through the transcripts of the evidentiary hearing.

### (iii) Voluntariness of Suárez-Del Valle's consent[14]

Defendant argues that his wife's consent to the search of the house was not voluntary. Suárez-Del Valle was "handcuffed," "in the back of a police unit," advised she was being arrested for obstruction," "not free to leave," and suffered "an epileptic attack" "minutes after giving her consent." **ECF No. 76** at 5.

From the outset, defendant does not challenge the voluntariness of his consent. Instead, he challenges the voluntariness of his wife's consent. Thus, foreclosing defendant's ability to raise any challenge from a subjective standpoint. This impediment brings the Court to the next step in this inquiry, to wit, "[d]etermining whether an individual's consent was indeed voluntary or instead the product of coercion requires a highly fact-specific inquiry dependent upon a careful scrutiny of the totality of the circumstances, rather than on a mechanical application of legal factors to a factual scenario." *U.S. v. Brake*, 666 F.3d 800, 806 (1st Cir. 2011).

The testimony confirms that at the time Suárez-Del Valle signed the search consent form, she was "calm and cooperating."[15] As a matter of fact, minutes before providing consent, since

---

[14] Notably, defendant does not argue that Suárez-Del Valle had no standing to consent, that the consent was limited to certain areas or that he or any other co-occupant canceled Suárez-Del Valle's authorization by objecting to the search. Instead, defendant only posits his wife's consent was not voluntary.

[15] **ECF No. 60** at 98.

she stepped away from the scene where defendant was being placed under arrest, "she was calmer,"[16] "[s]he was calmer. Once [defendant] had left the area, she appeared to be calmer."[17]

Moreover, before she provided consent, "[a]ttorney Gordon arrived talking loudly and screaming at [Suárez-Del Valle] that she was not to sign any document; that he was her attorney."[18] Yet, Suárez-Del Valle told PRPD officers "Let's go forward with it. I am the one signing this."[19] Suárez-Del Valle then signed the consent form and "seemed normal. She wanted to continue with the process… completely normal."[20] After listening to this testimony from Agent Nieves, counsel for the government introduced into evidence government's exhibit 16 (consent form signed by Suárez-Del Valle) to which defendant's counsel presented "**no objection**."[21] He then explained that "the top part was filled by [Suárez-Del Valle]," Agent Nieves filled out the "part where it says Bayamón," and Suárez-Del Valle "sign[ed] on the left hand side" next to Agent Nieves and PRPD Marrero-Chévere's signatures as witnesses.[22] Agent Nieves testified he "explained to her the details up to the point that we could get with this. Explaining to her that if she wanted to end the search at any given moment, she could do so."[23] Therefore, in this case, "[t]he record supports this finding. In particular, the testimony shows

---

[16] **ECF No. 60** at 141.
[17] **ECF No. 60** at 173.
[18] **ECF No. 60** at 143.
[19] **ECF No. 60** at 143.
[20] **ECF No. 60** at 143-144.
[21] **ECF No. 60** at 144 (emphasis added).
[22] **ECF No. 60** at 144.
[23] **ECF No. 60** at 145.

that" after removing her from defendant's presence, Suárez-Del Valle "was cooperative." *U.S. v. Brake*, 666 F.3d at 807.

Moreover, addressing defendant's argument that consent was not voluntary because Suárez-Del Valle was in custody, the Court underscores that "while the possibility of coercion may be heightened if the person is in custody at the time consent is obtained, custody alone has never been enough in itself to demonstrate coerced consent to search." *Id.*, citing *United States v. Jones,* 523 F.3d 31, 38 (1st Cir. 2008) (cleaned up); *see also Florida v. Bostick,* 501 U.S. 429, 435–36, (1991) (deeming consent voluntary even when detainee does not feel free to leave). More importantly, an attorney was present and advising Suárez-Del Valle not to sign the consent form. Despite the legal warnings available to her, Suárez-Del Valle decided to sign. Finally, there is no controversy as to the fact that she suffered an epileptic attack **after** the Ak-47 rifle and pistol magazine were found in her bedroom (plain sight) and **after** PRPD informed her that she was under arrest for such illegal items. In this case, the Court finds that the government showed by a preponderance of the evidence that the consent was voluntary. Even though defendant did not raise a challenge to the consent not being knowingly and intelligent, the evidence also speaks volumes (at least under a preponderance *quantum*) as to the fact that Suárez-Del Valle's consent was also given knowingly and intelligently. *Id*.

### (iv)   Exigent Circumstances

Defendant raised an objection to the R&R's alternative finding that the exigent circumstances exception applied in this case. Defendant argument, however, only attacks the Magistrate Judge's interpretation of *People v. Rivera-Martell*, 173 D.P.R. 601, 615 (2008). Specifically, he asserts that "Rivera-Martell, simply does not apply to the facts of the case at bar" because PRPD knew where to find defendant. **ECF No. 76** at 6. Defendant does not develop his argument any further. Even if the Court interpreted his argument in the light most favorable to defendant, his arguments are unavailing.

First, the Court need not consider exigent circumstance exception in light of the fact that, as discussed before, the search was conducted pursuant to a valid consent. But even if the Court entertained this alternative argument, the objection would be overruled. *People v. Rivera-Martell* interprets Rule 6 (probable cause for arrest) of the Puerto Rico Rules of Criminal Procedure in the context of two charged individuals **who were already under the custody** of the Puerto Rico Department of Correction and Rehabilitation. Beyond the fact that this case presents a completely different scenario, it also has nothing to do with Puerto Rico law enforcement officers' authority to arrest a person who commits a felony in their presence (for example, a felon in possession-like defendant), or, in general terms, when there is probable cause to believe a felony was committed.

Indeed, it is well settled law "Criminal Procedure Rule 6 establishes the procedure for issuing a warrant for arrest in accordance with the constitutional mandate… On the other hand, [under] Rule 11… a warrantless arrest may be made by a [law enforcement officer] when: (a) an offense has been committed in his presence; (b) the person arrested has committed a felony, although not in his presence; and (c) he has reasonable grounds to believe that the person has committed a felony." *Pueblo v Martínez-Torres*, 1988 WL 580853 (P.R.), 20 P.R. Offic. Trans. 515 (1988); *see* generally *Pueblo v. N. Caribbean*, 2004 TSPR 113 (P.R. June 30, 2004)(noting that "what we seek to avoid, is to have the probable cause for arrest hearing acquire the scope and formality of a preliminary hearing or become a 'mini-trial.'").

IV.    **Conclusion**

In light of all the above, the evidence, and the testimony on the record, as well as the motions on the docket, the Court finds that the government met its burden in this case. Thus, Court **OVERRULES** defendant's objection, **ECF No. 76**, to the R&R; **ADOPTS** the R&R at **ECF No. 74**, and thus **DENIES** defendant's motion to suppress at **ECF Nos. 25, 27.**

**SO ORDERED**.

At San Juan, Puerto Rico, on this 16th day of August, 2022.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**