## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Crim. No. 17-0582 (ADC)** |
| **RICHARD LÓPEZ-TORRES,** | |
| **Defendant.** | |

## OPINION AND ORDER

On February 16, 2023, a jury convicted defendant Richard López-Torres ("defendant") of one count of being a felon in possession of firearms and ammunition. **ECF No. 124**. Pending before the Court are defendant's motion for new trial at **ECF No. 136**, and motion for acquittal at **ECF No. 137**. The government timely responded to both. **ECF Nos. 138, 143**. For the following reasons, the motions are **DENIED. ECF Nos. 136, 137**.[1]

## I.    Procedural background

On November 9, 2017, a Grand Jury returned a one-count Indictment against defendant charging him with being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1). A Superseding Indictment was returned on October 24, 2019. **ECF No. 50**.[2]

---

[1] During defendant's sentencing hearing held on April 3, 2025, the Court orally denied his motions for new trial and acquittal, stating its reasons on the record. These reasons tracked those of this Opinion and Order, which was still being edited or reviewed at that point in time. Although the Court stated in the hearing that the opinion would issue when ready, through inadvertence, it was not until recently, that the undersigned noticed that the same had not been filed. The Court thus corrects its omission and supplements the record, providing a full account of its denial of defendant's motions. Fed. R. App. P. 10(e)(2)(B). This Opinion and Order is Nunc Pro Tunc, April 3, 2025.

[2] The Superseding Indictment added additional language to Count One pertaining defendant's knowledge of his status as a person having been previously convicted of a crime punishable by imprisonment for a term exceeding one year. It also added a firearm forfeiture claim.

The parties made several pre-trial filings before trial commenced on February 13, 2023. Of particular relevance to the motions at hand, on April 24, 2019, defendant, through counsel, filed a motion to suppress the physical evidence seized during a warrantless search that took place on October 27, 2017, the day of his arrest. **ECF Nos. 25, 27**. The government opposed. **ECF Nos. 29, 46**. Defendant's motion to suppress and related filings were referred to a Magistrate Judge for an evidentiary hearing and a report and recommendation ("R&R"). **ECF No. 48**. An evidentiary hearing was held on February 4, 2020. **ECF No. 58**. The government called four witnesses from the Puerto Rico Police Department ("PRPD"), to wit: Agent Roynashmil Rodríguez-Martínez ("Agent Rodríguez-Martínez"), Sergeant Luís Pacheco-Albizu ("Sergeant Pacheco-Albizu"), Officer Yomaira Marrero-Chévere ("Officer Marrero-Chévere"), and Agent David Nieves ("Agent Nieves"). Defendant did not call any witness on his behalf. Due to certain arguments raised by the defense during the evidentiary hearing (regarding errors in the metadata or time stamps of photographs submitted by the government as evidence), the Magistrate Judge granted defendant an additional opportunity to call witnesses on this issue. Nevertheless, on March 6, 2020, defendant informed he would not present any witnesses. **ECF No. 64**. After receiving post-hearing briefs, **ECF Nos. 70, 71**, the Magistrate Judge issued a R&R recommending the denial of defendant's motion to suppress. **ECF No. 74**. Defendant lodged objections to the R&R, **ECF No. 76**, and the government responded, **ECF No. 77**.

On August 16, 2022, the Court overruled defendant's objections to the R&R and adopted the Magistrate Judge's recommendations, denying defendant's motion to suppress at **ECF No.**

**81**. In its Opinion and Order, the Court analyzed the record before it and made the following

findings, which are repeated here at length for their relevance to defendant's motion for new

trial (**ECF No. 136**) and also to his separate filing for acquittal (**ECF No. 137**):

> On October 20, 2017, five people were shot in a restaurant located in Bayamón,
> Puerto Rico. Three were killed and another two, including a baby, sustained
> injuries. Agent Rodríguez-Martínez was assigned to the case. Thanks to a
> confidential informant and surveillance footage, defendant and eight other
> individuals suspected of being involved in drug trafficking were identified as
> suspects of the shooting. The investigation revealed that defendant was in charge
> of handing out and collecting back the weapons used on the day of the shooting.
> Moreover, the investigation placed defendant inside one of the motor vehicles
> used to carry out the shooting, which left more than 50 bullet casings in the scene.
> A background check performed by the PRPD revealed that defendant had been
> convicted of one or more felonies and that defendant did not have a license to
> posses a firearm in Puerto Rico. On October 22, 2017, while patrolling in Bayamón,
> another Officer Marrero-Chévere, received a radio message that there had been a
> shootout on Paseo A Street in "Pica Piedra," Bayamón, where defendant's
> residence is located. Eventually, Officer Marrero-Chévere pursued the suspects
> fitting the description relayed on the radio and found several individuals. Among
> them, Officer Marrero-Chévere found and arrested defendant in connection with
> the "Paseo A Street" shootout. Due to lack of evidence at that moment connecting
> defendant with the "Paseo A Street" shootout, the PRPD released defendant.
>
> PRPD Sergeant Pacheco Albizu, received authorization and planned to arrest
> several suspects of the October 20, 2017 massacre. A group of PRPD officers agreed
> to meet at a place nearby defendant's house, and around 7:00AM-8:00 a.m. some
> of them were instructed to conduct surveillance. Defendant was spotted sitting on
> the front steps of his house.
>
> Around 10:00 a.m., a group of PRPD officers arrived at defendant's house, which
> is located across the street from the residence of two other suspected participants
> of the same shooting. Defendant was no longer in front of his house. Standing
> outside the house in front of the gate, PRPD officers proceeded to call defendant
> out. Sergeant Pacheco-Albizu and Officer Marrero-Chévere testified that they saw,
> (through a metallic see-through gate) the defendant approaching them. **ECF No.
> 67-5** at 1. Defendant was seen holding with both hands a black firearm in front of

him. Still inside his house, following orders from the PRPD, defendant dropped the weapon and dropped to the floor.

Concerned for his safety and that of the other officers, Sergeant Pacheco-Albizu then gave instructions for Officer Ricardo Agrón to retrieve the breaching equipment from the trunk of Sergeant Pacheco's patrol car to forcibly open the gate. Moments later, the officers cut through the slide on the gate and gained entry to the residence. The firearm [defendant] had been holding lay on the floor to his left. See Government Exhibits 8 and 8A. He was immediately placed under arrest and taken outside of the house. **ECF No. 74** at 7.

Defendant's wife, Raquel Suárez-Del Valle ("Suárez-Del Valle") exited and tried to prevent PRPD officers from taking defendant away. Officer Marrero-Chévere testified that she then placed Suárez-Del Valle under arrest for obstruction of justice at 10:40a.m. Suárez-Del Valle was moved to a nearby patrol car where she was advised of her Miranda rights. Suárez Del Valle filled out a Miranda Rights form at around 10:45 a.m.

Defendant then moved for *in limine* relief in connection with evidence of his prior felonies, his ongoing state cases and other arrests after his state conviction. **ECF No. 90, 93**. Specifically, defendant requested that "the Court Order the government to not mention, directly or indirectly, to his state criminal cases." **ECF No. 93** at 5. The government responded and opposed on several grounds. **ECF No. 97**. First, the government argued that the request was overbroad. Second, it informed that it did not intend to dwell on the state offenses or length of the convictions, but that it would be "unreasonable to require the United States to avoid all mention of the underlying state cases" which were "unavoidably intertwined with Defendant's arrest and the seizure of the firearms charged in the indictment". **ECF No. 97** at 7. Third, the government pointed out that, in order for its evidence to make sense, some of its witnesses

would probably need to offer testimony as to the reason why they were at defendant's known residence, that is, the ongoing state criminal investigation. *Id*.

During the first day of trial, defendant's motions, as well as the government's response, were discussed and dully addressed. According to the Minutes of proceedings, **ECF No. 115**, before calling the case for jury selection, the Court held an:

> in chambers conference . . . from 09:29AM to 09:54AM to discuss housekeeping matters. Voir Dire and Preliminary instructions were addressed and discussed. In addition, the Motion In Limine filed by the defense at ECF No. [93] as well as the government's response filed at ECF No. [97] were discussed. The following were the rulings made by the Court during the in-chambers conference: The subsections A and B of the Motion In Limine filed at ECF No. [93] are MOOT, the First Notice of Intent to Present Expert Testimony filed by the government at ECF No. [101] is NOTED, and the government's Ex-Parte Motion Requesting Order filed at ECF No. [107] is NOTED and GRANTED.

**ECF No. 115**. Defendant did not renew his *in limine* petition, and neither did he object to the Court's rulings. Thus, trial commenced. Following a four-day trial, a jury convicted the defendant on February 16, 2023. **ECF No. 121, 124**.

On March 12, 2023, defendant moved for new trial. **ECF No. 136**. On even date, defendant moved for judgment of acquittal. **ECF No. 137**. The government responded. **ECF No. 138, 143**.

## II.    Legal standard

Defendant filed his motion for new trial under Fed. R. Crim. P. 33. *See* **ECF No. 136** at n.2. Fed. R. Crim. P. 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." *Id*. When assessing requests for new trial, courts may "weigh the evidence and evaluate the credibility of witnesses, . . . [but]

the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict." *United States v. Wilkerson*, 251 F.3d 273, 278 (1st Cir. 2001).

However, courts "must generally defer to a jury's credibility assessments[…] it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *U.S. v. Merlino*, 592 F.3d 22, 32–33 (1st Cir. 2010)(quoting *United States v. Cote*, 544 F.3d 88, 101 (2nd Cir. 2008) (internal quotation marks omitted)). Therefore, in general terms, a court has "greater latitude in considering a motion for a new trial than it does in considering a motion for acquittal[.]" *U.S. v. Merlino*, 592 F.3d at 33 (*citing United States v. Ruiz*, 105 F.3d 1492, 1501 (1st Cir. 1997).

Generally, a judgment of acquittal may be entered if the evidence is insufficient to sustain a conviction. *See* Fed. R. Crim. P. 29. In ruling on a Rule 29 motion, a court must consider the evidence "in the light most favorable to the prosecution" and determine whether the "body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt." *United States v. Lara*, 181 F.3d 183, 200 (1st Cir. 1999) (citations omitted). In doing so, the court "take[s] into account all evidence, both direct and circumstantial, and [to] resolve evidentiary conflicts and credibility disputes in favor of the jury's verdict." *United States v. Valerio*, 676 F.3d 237, 244 (1st Cir. 2012). Ultimately, the court need only determine that the conviction "finds support in a plausible rendition of the record." *United States v. Shaw*, 670 F.3d 360, 362 (1st Cir. 2012).

### III.    Discussion

#### A.    Motion for new trial

Defendant's motion for new trial challenges several "prejudicial acts" that "individually and in concert" allegedly violated defendant's due process and his right to a fair trial. **ECF No. 136** at 1. First, that "the government introduced prejudicial and inflammatory testimony disclosing to the jury that [defendant] was part of a murder investigation[.]" Second, the "exclusion of . . . testimony highlighting . . . that at least one other person . . . had control over and access to the weapon[.]" Finally, that the jury "needed to know" that one of the government's witnesses, Puerto Rico Police Department Officer Benjamín-Valentín, "committed perjury[.]" *Id*., at 1-2. Moreover, defendant argues that the Court erred by denying the "mere presence instruction." *Id*., at 15. Based on the above purported errors, defendant concludes that the Court must grant his motion for new trial. *Id*., at 16.

The Court will address each in turn.

#### 1.    Testimony related to a murder investigation

According to defendant's short-sighted version of the facts, the government's witness, Officer Marrero-Chévere, testified on re-direct that at the scene of defendant's arrest, "[t]here were several units there including the ones from – fellow officer from the CIC who were the ones who had this investigation, and this was the investigation of a murder case." **ECF No. 136** at 4. This single statement, in defendant's view, was "inflammatory and unfairly prejudicial." *Id*., at 9.

Defendant maintains that his claim of mistrial meets four factors considered by courts in evaluating a motion for mistrial: (1) that the "remarks were pronounced and persistent, creating a likelihood that they would mislead and prejudice the jury;" (2) that they were made in "bad faith on the government's behalf;" (3) that the "strength of the other evidence against the defendant" is not enough to carry the day; and (4) that "any curative actions taken by the district court" were insufficient. *Id.*, at 4. Even under defendant's standards, his argument fails.

The Court will discuss the first three contentions jointly and will explain why (1) the remarks were neither pronounced nor persistent, nor did they create a likelihood that they would mislead or prejudice the jury; (2) were not made in "bad faith," and, as matter of fact, (3) the "strength of the other evidence against the defendant" was more than enough to carry the day.

At the outset, any claim that the "prejudicial"[3] remarks cited above were "pronounced or persistent" is patently untrue. The only time when any information related to the state murder investigation came to light was on the single occasion described below during the government's re-direct examination of its fourth witness:

> Q. And during cross you indicated that there were several officers with you, more than ten.
>
> A. Yes.
>
> Q. Why did you and your -- why did you need at least ten officers to go there?

---

[3] For the sake of discussion, the Court will assume (without deciding) that the statement was prejudicial—even though it ultimately concludes that it is not.

A. There were several units there including the ones from -- fellow officer from the CIC who were the ones who had this investigation, and **this was the investigation of a murder case**.

**ECF No. 130** at 89. Therefore, even under defendant's self-imposed legal standard, his request fails because the prejudicial testimony was anything but "pronounced and persistent." *Id*. In any case, the prejudicial portion of the testimony did not even disclose the facts underlying the murder investigation.

Because defendant cannot make a serious claim that the prejudicial portion of a single line of testimony was "pronounced and persistent," he resorts to ancillary arguments that do little, if anything, to tip the scale in his favor. To wit, defendant argues that the "government[] intended to persuade [the witness] to mention the murder investigation by asking her whether she was armed, why she was armed and why there were so many officers present to make the arrest of [defendant]." *Id*., at 5. This is a grave misconstruction of the record.

The truth of the matter, as evinced by the trial transcripts, is that the government abided by its proffer and court ruling, *in limine*, not to present evidence regarding state murders that had led to issuance of arrest warrants against defendant López-Torres and others. The first three witnesses for the government testified without making reference to any such events. Through-out cross-examination, it was defendant who kept persistently questioning police agents, on the large number of police officers present during the arrest creating doubts or issues as to why such a large number of law enforcement officers was needed.  In response to questions posed in cross-examination, the government chose to tackle the situation by having its witnesses testify about

"the dangerousness" of the area or vicinity in which they were to execute the arrest, without any reference to the murder investigation. It was not until the fourth witness testified (PRPO Marrero-Chévere) that reference was made to the fact that the reinforcement or presence of the CIC personnel responded to "this relating to a murder investigation." The record reflects that it was the defense, who despite being aware of the *in limine* rulings, kept persistently digging in this sensitive area as per their initial arguments. The sequence of events and the unexpected response by Agent Marrero-Chévere while justifying the presence of a large number of officers on site, along with the government's acquiescence to a curative instruction, does away with any "bad faith" argument defendant could possibly allude to. Reference to such "an investigation" was isolated (once) and did not provide any additional details concerning the same, nor did it implicate defendant López-Torres directly.

More so, the government did not mention the nature of the state investigation in its opening statement or through any other witness. Nevertheless, the defense—in spite of having moved *in limine* to exclude any references to the state investigation—attempted to include arguments in its opening statement pertaining defendant's partner, Raquel Suárez-Del Valle, and her son, Rivera-Suárez, and to the effect that the latter lived in the house where defendant was arrested and had control over items inside the house.[4] Actually, during opening statements,

---

[4] Defendant perfunctorily raised an issue as to whether or not the house where he was arrested was his home. This is yet another argument by the defense that is contrary to the record. A witness for the government testified that after defendant's arrest and while gathering personal data for booking purposes, defendant was asked about his address and place of residence. To this question defendant answered: "Paseo B Street, No. 66, Alturas de Bayamón

the defense alluded to Mr. Rivera-Suárez' alias being "Satanas" or "Satan."[5] The Court held a sidebar to address the government's objection over those opening remarks. At that moment, at the very beginning of the trial, the Court warned defendant as to the implications of opening the door to the subject and nature of the state investigation, his state court co-defendant, Rivera-Suárez, and details about his state court case.[6] **ECF No. 129**.

> To wit, *inter alia*:
>
> If you force the government to go into the fact that they are co-defendants and that he's a fugitive, then your theory that he lives in that house and exercises control for being a fugitive goes away. So you have opened the door right now.
>
> . . .
>
> But you're saying and you're offering to the jury to establish that he lives there and exercises control, and the government has proffered that from what they know he's a fugitive and also a co-defendant. *Id.,* at 25-26.

Moreover, from the opening statements the defense started calling into question the methods used by the police in carrying out defendant's arrest, including the nature of the investigation, the show of force by the law enforcement agents, the state charges, and Rivera-Suárez's control over the items inside the house. Specifically, the defense argued to the jury that

---

in Bayamón, Puerto Rico," the exact place of his arrest. It is worth noting that the defense managed to interrupt the witness's testimony by raising an unsupported hearsay objection. **ECF No. 129** at 35-37.

[5] The government correctly objected on two grounds. First, that no reference was to be elicited to the state murder investigation. Defendant knew that Rivera Suárez was a co-defendant in state murder case and also knew of his "fugitive" status, fact which prompted the investigation and patrolling by the Puerto Rico police. More so, defendant being aware of Rivera-Sanchez' fugitive status, had no good faith basis to assert that Rivera-Sánchez (aka "Satan") was staying at the residence.

[6] As discussed elsewhere in this Opinion and Order, the Court never curtailed the defense from presenting their case, theory, or defense.

defendant "came out with the gun in his hand to greet 12 officers, armed officers. And I ask

you… Does it make sense? Does it make sense that… a person that the Puerto Rico police was

under [sic] investigation, would come out the door to confront 12 armed officers? Does it make

sense?" *Id.*, at 29. This kind of statement by the defense called for the government to explain the

need to have "12 armed officers" at the scene. In spite of defendant's actions, the government

exercised extreme caution.

The defense dug even deeper during its cross-examination and closing arguments. For

example, and without being exhaustive:

Q. How many police officers did you see?

A. It could be more than 15.

Q. And how many officers did you see inside the house?

A. At the time when I arrived there were three to four in the entrance.

**ECF No. 130** at 29.

Q. More than ten?...

Q. More than 20?

A. I can't specify.

Q. But we at least know it's more than ten, correct?...

Q. And they were all armed?

A. We all have our service weapons.

Q. But that day all the officers there were armed?

*Id.*, at 67-68.

Q. … do you know how old [Raquel Suárez-Del Valle's] children was at the time?

*Id.*, at 83.

Q. How many officers made entry into the balcony area to make the arrest?

**ECF No. 129** at 105.

Q. And all these officers were armed, correct?

A. Yes.

Q. And your testimony here today is he came out of the door holding a gun and not one police officer shot their weapon?

A. No, because he abided by the instructions.

MR. WHETSEL: If I could have one moment, Your Honor.

Q. So you just answered that nobody used their weapon because he complied with instructions, but at any point did anybody take out their weapon and point it at Mr. López?

*Id.*, at 106.

MR. HERNÁNDEZ-GARCÍA: … [they] searched the living room, [they] searched other areas. The master bedroom was the last room searched. The master bedroom is here marked in M to the right. Her son's room is marked in H to the left.

**ECF No. 131** at 87 (defense's closing argument).

Moreover, during closing arguments, it was the defense who also made statements to the jury about the state court case and why the state government did not charge defendant with some of the other weapons found in the house. *See* **ECF No. 131** at 89 ("At the very least we

know at least the **rifle**, the **PRPD didn't even charge him**, but the government brought the **rifle** here and charged him with it." (emphasis added)).[7]

Therefore, the totality of the record shows that the defense (purposely or not) elicited information throughout the trial concerning state charges that could only be explained by alluding to the state murder investigation and related circumstances. In spite of the multiple references to matters related to the state case and charges, the government abided by the Court's ruling. It was only once, when a witness who had been persistently questioned in cross-examination about what warranted the presence of numerous agents at the arrest site, that unexpectedly an isolated reference to a murder investigation was made. Defendant now claims this is unfairly prejudicial, but the record reflects that, aside from Agent Marrero-Chévere's single and general statement regarding a state murder investigation, the government did not go into additional details in spite of defendant's continued attempts to induce the government or it's witnesses into error.

Notably, defendant seems to understand the issue, yet he chooses to apply it only when it benefits him. To wit, further down in his motion for new trial, defendant contends "[t]he question… was in response to testimony elicited by the government, thus, it was fair game."

---

[7]As explained by the prosecution in a **sidebar**, the issue with that statement was that "if he's going into what [the state government] didn't charge, I can go into what the state did charge… they did file for murder and two separate incidents, and the use of weapons in two separate incidents[.]" **ECF No. 131** at 90. Confronted with this issue, the defense simply disowned their actions: "MR. HERNÁNDEZ-GARCÍA: Judge, I mean I just focused on the firearms, not anything else. THE COURT: I'm sorry? MR. HERNÁNDEZ-GARCÍA: I just focused on the firearms, I didn't say anything else. THE COURT: No, no, you said, and you were talking about the rifle… And you did say that, that he didn't get charged for the rifle." **ECF No. 131** at 89-91.

**ECF No. 136** at 11. But the defense's strategy aside, the record shows that defendant's argument is meritless.

Zooming in on the single comment at issue, even though it came out on the government's redirect, the reason why it reached the jury was precisely because of the defense's questions. On cross examination, the defense asked Officer Marrero-Chévere:

> Q. And how many officers were on the inside of this home?
>
> A. Several. There were several of us.
>
> Q. More than ten?
>
> A. It could be.
>
> Q. More than 20?
>
> A. I can't specify.
>
> Q. But we at least know it's more than ten, correct?
>
> A. Probably.
>
> Q. And they were all armed?
>
> A. We all have our service weapons.
>
> Q. But that day all the officers there were armed?
>
> A. Yes. We were on duty and had our service weapons.

**ECF No. 130** at 67-68. On re-direct examination, the government was all but compelled to ask: "Q. Why… did you need at least ten officers to go there?" *Id.*, at 89. The witness' response was the statement defendant puts at issue:

> A. There were several units there including the ones from – fellow officer from the CIC who were the ones who had this investigation, and this was the investigation of a murder case.

*Id.* This response took the government by surprise, as evidenced by the discussion at side bar immediately following it.[8] *Id.*, at 91. Instead, and in line with what other witnesses testified, the government expected Officer Marrero-Chévere to refer to the dangerousness of the place and other factors. *Id.*, at 88-89. Based on that isolated comment, the defense moved for a mistrial. *Id.*, at 90. However, as discussed in open court, the caselaw is clear in that notice under Fed. R. Civ. P. 404(b) was not required in this particular case. *See United States v. Epstein*, 426 F.3d 431, 439 (1st Cir. 2005). Contrary to defendant's ill-conceived mistrial ground, the murder investigation was intertwined with the offense conduct. Indeed, as explained by the government several months ahead of trial, "defendant knows from the state trial and discovery in this case, the Taurus pistol seized in this case was used in the murders that he was charged with." **ECF No. 143** at 7.

Moving to the third prong, the Court must determine whether, if that "prejudicial" evidence had never reached the jury, the testimony of the other law enforcement agents who participated in defendant's arrest or other evidence available was more than enough to carry the day. The record and weight of the evidence presented compels an answer in the affirmative.

As to the final prong alluded to in defendant's motion, the Court did in fact provide a "curative" instruction that was sufficient. **ECF No. 136** at 4. Immediately after the statement, the

---

[8] Notably, the truthfulness of the answer is undisputed and known to defendant from discovery received in regard to the state case.

Court issued a curative instruction to the jury.[9] Specifically, the Court instructed the jury as follows:

> Ladies and Gentlemen, you heard from the witness about an investigation being conducted by the CIC that, she understands, was being conducted by the CIC that related to a murder. Regardless of what or could have been Agent Marrero's understanding at the time, you're specifically instructed not to consider such information as evidence directly related or against the defendant who remains protected by his constitutional right to be presumed innocent. So that's my instruction to you. Anything else? Any additional questions?

**ECF No. 130** at 99. The instruction was opportune and strong. The First Circuit "has repeatedly held that a strong, explicit and thorough curative instruction to disregard improper comments by the prosecutor is sufficient to cure any prejudice from prosecutorial misconduct." *United States v. Riccio*, 529 F.3d 40, 45 (1st Cir. 2008). Moreover, "[i]t is a well-established tenet of our judicial system that juries are presumed to follow such instructions." *United States v. Gentles*, 619 F.3d 75, 82 (1st Cir. 2010). Moreover, courts "assume the jury . . . have followed the court's instructions." *United States v. Rodríguez*, 675 F.3d 48, 58 (1st Cir. 2012) (*quoting United States v. Salley*, 651 F.3d 159, 167 (1st Cir. 2011)).

Accordingly, under defendant's standards, the two-word mishap (*i.e.*, "murder investigation") was not unfairly prejudicial as to deprive defendant of his right to due process and a fair trial. After all, under Fed. R. Evid. 403 defendant is protected from "unfair prejudice[,]" "not against all prejudice." *United States v. Whitney*, 524 F.3d 134, 141 (1st Cir. 2008).

---

[9] The Court asked the defense team to propose an instruction or to make any suggestions. The defense declined the Court's invitation and, instead, reiterated their objection to the curative measure, without more. **ECF No. 130** at 97-98.

### 2.    The exclusion of testimony

In his second argument, defendant contends that he "was deprived of his right to present a complete defense and to elicit relevant, important, and reliable evidence." **ECF No. 137** at 9. Defendant asserts "he could not inform the jury that other people, including Su[á]rez [Del Valle]'s adult children, lived at the residence and had access to and, possibly, possession of the weapons and ammunition." *Id*., at 11. To conclude, defendant further asserts that the "[e]xclusion of evidence regarding other individuals who resided in the home and erroneous evidentiary rulings regarding 'opening the door' deprived Mr. López of a fair trial." *Id*., at 12.

First and foremost, the record is clear that the Court did not curtail or impede the defense from presenting any defense theory to the jury. As discussed before, the government (not the Court) objected to the defense's opening remarks, which would have otherwise identified or lead to the identification of defendant's stepson as "Satan." Defendant knew "Satan" was his co-defendant in the state murder case and also knew of his fugitive status. Among other warnings made by the Court in sidebars, the Court made it perfectly clear to the defense that "[y]ou decide what you want to do. I'm not instructing, but then don't complain of what the government must do in order to clear the air." **ECF No. 129** at 85. Defendant's argument is thus based on a mischaracterization of the trial record. What the record clearly reflects is that defendant moved *in limine* to exclude evidence that he later and consistently attempted to present (evidence regarding the state murder and sate-codefendant), without allowing the government to explain or set in context.

Aside from this evident mischaracterization, the fact remains (and defendant did not address it in his motions or during trial) that he had no direct evidence to present in his case-in-chief regarding Rivera-Suárez's nickname, his whereabouts, or his residence.[10] None of the government's witnesses testified to that end either. Thus, had the Court not warned defendant as to the potential perils of introducing certain information (during opening statements) about Rivera-Suárez, the government's objections would have been sustained on grounds that the opening statement cannot present the jury with statements that defendant, in good faith, cannot say are based on evidence available to the defense. In other words, defendant could have presented, if available, evidence that Rivera-Suárez lived at the residence where defendant was arrested.[11]

In his concurrence in *United States v. Dinitz*, 424 U.S. 600, 612 (1976), Chief Justice Burger "emphasize[d] what is plainly implicit in the opinion, *i. e.,* a trial judge's plenary control of the conduct of counsel particularly in relation to addressing the jury." More importantly, he clarified, "[a]n opening statement has a narrow purpose and scope. It is to state what evidence will be presented . . . and to relate parts of the evidence and testimony to the whole; it is not an occasion for argument." *Id.*

---

[10] To so establish, defendant needed the testimony of government agents whose knowledge on the subject, if any, constituted hearsay or was obtained through the state murder investigation which they could not testify about on direct examination.

[11] Ultimately, defendant could not present such evidence because of Rivera-Suárez's fugitive status. Still, defendant placed before the jury evidence that Ms. Suárez's children lived or had a room at the residence and placed the responsibility for the evidence seized in the master bedroom on Ms. Suárez (albeit, through further mischaracterization of the evidence).

Moreover, defendant also points to the fact that his questioning of Officer Marrero-Chévere with respect to the age of Suárez-Del Valle's children evinces that the Court did not allow him to present his theory. Yet, contrary to defendant's assertions, the record demonstrates that it was the government who interjected with a timely objection that was correct under the law:

Q. Do you also know how old she was at the time of her arrest?

A. If I'm not mistaken, 47.

Q. All right. To your knowledge, do you know how old her children was at the time?

MS. COLLAZO-ORTÍZ: Your Honor, we have an objection.

THE COURT: Sustained.

MR. HERNÁNDEZ-GARCÍA: Your Honor, what's the foundation?

THE COURT: Approach. (Sidebar discussions begin.)

THE COURT: Can we lower the volume.

MS. COLLAZO-ORTÍZ: You're Honor, we're objecting both on relevance and we're also objecting because she has no personal knowledge. Whatever information she has about the children's age she got from Raquel, so it's hearsay.

THE COURT: But can you –

MS. COLLAZO-ORTÍZ: Whatever information she has about the agents she got from interviewing Raquel, so it's hearsay.

THE COURT: Okay, and besides that.

MS. COLLAZO-ORTÍZ: And it's irrelevant.

THE COURT: Here we go back to the opening. You're trying to put this individual in there without opening the door for anything else, but aside from that your proffer is she doesn't know.

MS. COLLAZO-ORTÍZ: Well, she does know because it's in her notes, but she got it from an interview with Raquel so it's hearsay, and she doesn't have personal knowledge.

THE COURT: And what would be the relevance of this?

MR. HERNÁNDEZ-GARCÍA: Your Honor, I'm following the same line of question they asked about her height, her hair color, why was that relevant. She took that information, it was a witness interview.

THE COURT: She didn't say she took that information.

MS. COLLAZO-ORTÍZ: That's information she saw.

THE COURT: That's the thing; you keep putting words in her mouth. She said she took that information. She said she arrested. If you go and you lay your foundation and ask what information she took from Raquel, if any, that's a separate thing, but she hasn't said that she took that information or that she got the information of the children from her.

MR. HERNÁNDEZ-GARCÍA: Okay.

MS. COLLAZO-ORTÍZ: But that objection would still be hearsay, Your Honor, because Raquel is not a witness so whatever information this witness has it's what Raquel said and she's not a witness subject to cross.

MR. HERNÁNDEZ-GARCÍA: Your Honor, we objected several times to what Raquel actually said and we -- you know, because of here the same [him] foundation.

THE COURT: I'm sorry, I didn't get that.

MR. HERNÁNDEZ-GARCÍA: I'm saying that the government's arguing now that whatever Raquel said is hearsay, right. We objected several times because –

THE COURT: And actually to the attorney, you objected and then you asked everything about that as well.

MS. COLLAZO-ORTÍZ: But I didn't go into the contents of what Raquel had said. I was careful to avoid the contents of her -- THE COURT: You instructed with witness without saying what Raquel said to what –

MS. COLLAZO-ORTÍZ: Correct. We did not go into anything of –

THE COURT: That's true. So here the question would be relevance. And the first question that would have to be posed is whether she has personal knowledge or whether she received any information that she may have from another person. Is Raquel going to testify here?

MS. COLLAZO-ORTÍZ: No, Your Honor.

THE COURT: So let's move on.

MR. HERNÁNDEZ-GARCÍA: Thank you, Your Honor. (Sidebar discussions end.)

THE COURT: Matters of relevance and lack of foundation, it's sustained[12].

**ECF No. 130** at 83-86. The above cited exchange evinces that defendant's argument fails.

### 3.    Officer Benjamín Valentín's perjured testimony regarding a material fact went uncured.

Defendant next argues that one of the government's witnesses[13] committed perjury when he testified regarding a "material and crucial fact," (*i.e.* that he did not move the gun found at the scene prior to it being photographed by personnel from the Police Department Forensic Unit). **ECF No. 136** at 12, 13.  It appears from the record that through discovery, the defendant had secured a transcript from a previously held sate evidentiary hearing. Defendant argued: "However, in a previous state criminal proceeding, occurring on January 29, 2021, and 13 regarding the same events surrounding Mr. López's arrest, Valentín testified that he did move the gun, and had to place it back so that it could be photographed." *Id.* Defendant claims he was

---

[12] The record reflects that after the sidebar, defense counsel continued cross-examination, attempting to ascertain the witness personal knowledge about the information he was attempting to elicit. However, at a given point, after consulting with his co-counsel, the line of questioning was abandoned. Accordingly, it is clear that defendant was attempting to elicit and construe a defense theory on hearsay for which he had no direct evidence.  **ECF No. 130** at 87.

[13] Reference being made to the testimony of PRPO Benjamín Valentín.

left with no choice since he "could not effectively confront [the witness] with his prior testimony because of the court's prior rulings that he would be opening the door to the murder investigation." *Id.*[14] Thus, he claims, a new trial is warranted because "the fact that Valentín has provided conflicting testimony regarding the movement of the firearm is a matter for jury consideration regarding . . . bias and credibility." *Id.*, at 13.

The answer to this puzzle, once again, lies in the record. First, the objection was raised by the defense the day after the testimony in controversy and after another two witnesses had taken the stand. It was thus not timely raised. In fact, at the time it was made, the jury was ready to hear closing arguments. Now, context being important in this type of situations (*i.e.* where the defense claims the Court acted in a certain way or another), the complete record is key. Accordingly, the Court will reproduce the relevant portions of how this issue came about during trial (before the jury was called in). The defense stated:

> We think that since he testified under oath yesterday in a diversion, a directly opposite way, that that is perjured testimony would be our position.
>
> If not, to the extent that we could have attempted to impeach, we were not able to do that during this trial, Your Honor, given some of our pretrial rulings. Of course there's an investigation that has been put before this jury. We've been under pretty strict orders not to go beyond that.
>
> THE COURT: I'm sorry, I'm sorry, I'm sorry, there's a pretrial investigation in this case on another matter, okay. And besides that which are my rulings? Because so far, as I understand, the defense is the one interested in keeping the nature and

---

[14] Defendant was alluding to PRPO Valentin's prior testimony in state court regarding the seizure of the weapon that agents saw in defendant's possession at the time of arrest. Any discrepancy between the state testimony and PRPO Valentin's testimony at trial would have consisted of proper impeachment and could have been treated as such: a prior inconsistent statement on a trial related matter that did not require of any reference to the state murder charges and pending case.

substance of that investigation out of scope and out of the trial, which I understand the reasons, and that has been kept out. So what are my rulings?

MR. WHETSEL: Right, so the ruling to -- it is my understanding that whenever we would ask anything about that investigation, other people involved in the investigation, anything along those lines that we may be opening the door. And so that's just why I'm saying I could not confront the witness with a transcript –

THE COURT: Impeachment has nothing to do -- proper impeachment has nothing to do with keeping -- and actually that instruction was for the government in keeping out of the way the investigation at state level and any sort of charges that could have been or have been filed -- because I'm not even clear as to whether they have actually been filed -- and for the benefit of the defendant and to avoid the jury listening about any other violent offenses for which he could have been investigated.

Actually the instructions always were that the defense here was trying to capitalize on the large contingent of agents that were present as something that was unwarranted or something that came from the blue, and the government was in the difficult situation that they had to deal with that situation without being able to explain why there was the need for 15 or 20 agents or 10 or 15 agents present at the location. So I think that simply that is -- what you're arguing is not supported by the facts of this case.

And actually during the trial I don't think -- that'll be for the Court of Appeals, the record is there. I don't think there's any such connotation as to preclude proper impeachment that you were able to do.

MR. WHETSEL: Okay.

THE COURT: And you had with what. And it seems that based on your proffer that you had something.[15]

MR. WHETSEL: […] So, again, that is why we made the decision not to confront him with the state court prosecution of a murder because that is information we are clearly trying to keep out of the ears and knowledge of the jury. To that extent, we believe the government was aware of this, and we don't know whether or not they were. So prior to the pretrial conference this morning, Your Honor, we did make them aware of what we believe to have been perjured testimony; because we are offering as persuasive authority on this issue *United States v. LaPage*, at 231

---

[15] In reference to the fact that the defense was in possession of transcripts of PRPO Valentin's testimony in state proceedings.

F.3d 488 from the Ninth Circuit; as well as *Napue v. Illinois*, at 360 U.S. 264 from the Supreme Court as binding authority on this issue.[16]

**ECF No. 131** at 24-26.

It is undisputed that the alluded discrepancy in PRPO Valentín's testimony, though not significant, would have been impeachment material. It was the defense's conscious and planned strategy not to impeach the witness on this matter. The government had provided *Jencks* material beforehand and had provided the defense with the transcripts at issue. Moreover, the Court can safely assume that the defendant knew about the alleged inconsistency in the sequence of events that PRPO Valentín testified about; because the prior testimony had been available to defendant weeks before trial. The same cannot be said of the government (the defense admitted telling the government of the intended challenges and trial strategy, minutes before the hearing started), which brings up an issue with defendant's arguments under *Napue.*

In *Napue v. Illinois*, 360 U.S. 264 (1959), a government's witness testified on direct examination that "he had received no promise of consideration in return for his testimony." *Id.* at 265. The truth was that the prosecutor had "promised him consideration." *Id*. Yet, after listening to the witness's response, the government did nothing to correct testimony. Under those circumstances, the *Napue* Court held that the prosecutor "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction" regardless of whether the

---

[16] As reflected by the record, the defense once again shifted arguments. From an initial argument of being somehow limited by the Court, once confronted with the fact they had waived proper impeachment, the defense raised a new argument asserting that the government had introduced testimony it should have known was perjured.

prosecutor "solicit[s] false evidence" or "allows [false evidence] to go uncorrected when it appears" as it violates the due process of law. *Id.* at 269. This is not the case here. Here, PRPO Valentin's testimony was consistent about having seen defendant with the weapon, where was the weapon placed on the floor and from where he had seized the weapon. The only discrepancy alluded by defendant was as to whether or not PRPO Valentin had seized the weapon from the floor prior to being photographed by forensic services and later placed on the same location where seized to enable photographing. Again, the government was made aware of the alleged discrepancy in PRPO Valentin's testimony minutes before the defense raised the issue with the Court.

    *Napue* can be easily distinguishable. Here, in the case at bar, PRPO did not provide perjured testimony and no testimony contrary to the evidence was endorsed by the government. As explained in *United States v. Mangual-García*, 505 F.3d 1, 10–11 (1st Cir. 2007), when a defendant "knows about the false testimony and fails to bring it to the jury or the court's attention, the assumption is that he did so for strategic reasons, and the defendant will not be allowed to question his own strategic choices on appeal." *Id*. In this case, however, there is no need to assume, because the defense readily admitted they knew about the discrepancy but decided not to raise the issue until after the parties had submitted their cases. Much like in *Mangual-García*, "this case [does not] present unusual circumstances that undermine this presumption, such as when the failure to object is the result of defense counsel's conflict of interest . . . or when the defendant was prevented from raising or pursuing the issue at trial by

circumstances essentially beyond his control. *Id*. (quoting *United States v. Iverson,* 648 F.2d 737, 739 (D.C. Cir. 1981)).[17]

Finally, the defense seems to imply that the Court erred in not recalling the witness even though he was available.[18]  But, as the government correctly noted in its response, "the fact is that [defendant] never requested that [the witness] be recalled." **ECF No. 143** at 12. Furthermore, when the Court suggested to recall the witness, the defense countered with a different course of action:

> MR. WHETSEL: Your Honor, just to propose a remedy, if he were to be recalled, if he were to be confronted, and if he were to explain I testified there that and I testified here maybe I did move it, but I still placed it right back where it was, why can't the jury just become available of that prior testimony during closing argument?
>
> THE COURT: Because the jury will hear and see his demeanor and will hear his explanation as to what truly happened and how he knows or doesn't know that he placed it in the same place.
>
> MR. MERCADO: You're asking the judge to essentially become the factfinder by having her make that decision.
>
> THE COURT: Unless there's a stipulation as to something I will not decide what this witness –
>
> MS. COLLAZO-ORTÍZ: If it's the defense position that –

---

[17] The Court questioned defendant's citation to a Ninth Circuit case where there was plenty of First Circuit authority on the issue. **ECF No. 131** at 26, 34-35 and 54-60.

[18] Indeed, the Court decided not to recall the witness and was never specifically asked to do so. As explained before, when a defendant "knows about the false testimony and fails to bring it to the jury or the court's attention, the assumption is that he did so for strategic reasons, and the defendant will not be allowed to question his own strategic choices on appeal." *Id.* "[D]efendant's strategic failure to object to false testimony will not create a *Napue* violation." *U.S. v. Flores-Rivera,* 787 F.3d 1, 32 (1st Cir. 2015).

. . .

THE COURT: I will not be deciding what the witness will be testifying or how he will be testifying. I can say one thing, had the defense raised it, this is clearly proper impeachment. But you chose not to do so failing your duty as counsel and your duties towards the Court and the honesty and transparency of the proceedings **and take a technical advantage on this**.[19]

MR. WHETSEL: Your Honor was saying that you thought it was proper impeachment but that we have handled this incorrectly? Is that Your Honor's.[20]

THE COURT: Mm-hmm.

MR. WHETSEL: Are we okay with her just making that ruling? Just go ahead and make that ruling that we –

THE COURT: Of course you'd like me to go ahead and make that ruling, that's what you want, and preserve the issue on appeal. That's what I call the perfect trial by ambush either on the government or on the Court. I will take a five-minute recess. Call Agent Valentín, see where he is, and if he can be here in what time frame.[21]

MR. MERCADO: We'll give him a call, Your Honor, and see where he is.

THE COURT: And if you have to send for him and transport him get him in. And let me have -- okay, I have the two cases, that's fine. (Sidebar discussions end.)

**ECF No. 131** at 42-44.

---

[19] This determination is supported by the case's procedural stance and the fact that defense counsel offered transcripts that were in the Spanish language for which no translations were offered or available. The translations were subsequently ordered by the Court in order to preserve the record. **ECF No. 131** at 46.

[20] Once again defendant procures shifting alternatives to insert controversies for appeal. While having been told they had done "strategic trial choices" they procure to induce a finding of ineffective assistance, which is not supported by the record.

[21] The record reflects that the measure of ascertaining PRPO Valentin's availability was a cautionary one while the Court examined the case law cited by defendant: *Napue v. Illinois*, 360 U. S. 264 (1959) and *U. S. v. LaPage*, 231 F.3d 488 (9th Cir. 2000).

The record reflects that PRPO Valentín testified consistently, in state and federal proceedings as to where in the floor defendant's weapon was located the time of arrest. The alleged discrepancy was that at the state level, he appears to have stated that the weapon, being seized from same location, had been seized prior to being photograph by the forensic team and subsequently placed on the initial location for photographs to be taken.  In the best of scenarios, this issue only goes to weight of the evidence.

On a final note, the challenged answer by the witness is minor discrepancy in light of the totality of the evidence and the testimony presented by the government. Notably, several other witnesses testified as to the events leading up to, during and after defendant's arrest. In that same vein, the Court cannot simply hold that this witness's minor discrepancy is tantamount to "perjury" *per se*. "Inconsistent testimony by itself does not amount to perjury, nor does an unclear police report make it so." *United States v. Tavares*, 93 F.3d 10, 14 (1st Cir. 1996).

### 4.    Mere presence instruction and cumulative effect.

Defendant asserts that he was entitled to a "mere presence" instruction. He was not. As discussed before, there was testimony clearly stating that defendant admitted that the house where he was arrested was his residence. *See* **ECF No. 129** at 35-37; *United States v. Echeverri*, 982 F.2d 675, 678 (1st Cir. 1993) ("a defendant's 'mere presence' argument will fail in situations where the 'mere' is lacking"). Moreover, to this point, the Court explained that "even if some other person could have been equally or more responsible or a participant, it doesn't take away, one, from the government's burden of proof; and doesn't take away from the fact that this individual

was, as per testimony of those agents, observed as an active participant and committing a crime in their presence by possessing a weapon that they [identified] as a pistol." **ECF No. 131** at 22; *see also id.,* at 21-23. Furthermore, the  instructions given to the jury, read as a whole, spoke loud and clear about the need to find that the government had to prove beyond reasonable doubt that (1) the defendant was a felon and knew that he was a felon; (2) the defendant was in knowing (defined by the Court more than once, *see, e.g.,* **ECF No. 133** at 11-18) possession of the firearm or ammunition; and (3) the firearm or ammunition traveled in interstate or foreign commerce. *See* **ECF No. 122**.

Finally, it cannot be said that in this case the Court committed a "column of errors." *United States v. Sepulveda*, 15 F.3d 1161, 1195–96 (1st Cir. 1993). But more importantly, based on the discussion above and the full record, a "[c]umulative-error analysis is inappropriate" when, as here, "a party complains of the cumulative effects of non-errors." *United States v. Rosario-Pérez*, 957 F.3d 277, 302 (1st Cir.  2020) (quoting *United States v. Stokes*, 124 F.3d 39, 43 (1st Cir. 1997)). The Court would order a "new trial on the basis of cumulative error only if multiple errors synergistically achieve the critical mass necessary to cast a shadow upon the integrity of the verdict." *Id.* (quoting *Williams v. Drake*, 146 F.3d 44, 49 (1st Cir. 1998) (internal quotation marks omitted). Assuming in arguendo that this Court may have committed some errors, they were not significant enough to outweigh the totality of evidence in this case, which supports the jury's guilty verdict.

### B.      Motion for acquittal

In addition to his motion for new trial, on March 12, 2023, defendant also filed a three-page motion for acquittal rehashing the exact same arguments presented by the defense for acquittal under Fed. R. Crim. P. 29 after the conclusion of the government's in-chief case, and again, at the close of the trial. **ECF No. 137** at 1. As evinced by the record, the Court denied both previous motions in open court. *Id*. The government opposed defendant's motion for judgment of acquittal. **ECF No. 138**.

Defendant's request hinges upon a single argument, to wit, that the "evidence was insufficient to prove . . . that he knowingly possessed firearms or ammunition." **ECF No. 137** at 2. In support he contends that there is no evidence "connecting" him to the firearm and that the government witnesses' testimony linking him to the gun was "contradictory, unreliable, and false." *Id*. In any event, defendant asserts that there is no evidence (even for purposes of constructive possession) aside from what he calls evidence of "mere presence." *Id*., at 3. Finally, without more, defendant recycles the same "inconsistencies" and repackages them as a "reasonable doubt" in a single paragraph. His argument is easily disposed of.

Notably, defendant's attack only charges against the credibility of the witnesses. Indeed, as discussed before, the government presented several witnesses attesting to the fact that they had seen defendant holding a gun the day of his arrest. This constituted direct evidence against

defendant. Thus, defendant only adduces that such testimonies are not credible. However, this argument is not only unsupported and legally wrong but is a matter that belongs to the jury.

Contrary to his argument in assessing motions under Fed. R. Crim. P. 29, Courts must "take into account all evidence, both direct and circumstantial, and [to] resolve evidentiary conflicts and credibility disputes in favor of the jury's verdict." *United States v. Valerio*, 676 F.3d at 244 (emphasis added). That is, "the court must view the evidence, together with all reasonable inferences that may be drawn therefrom, in the light most favorable to the government." *United States v. Loder*, 23 F.3d 586, 589 (1st Cir. 1994).

Thus, even if defendant were successful in creating some theory and pointing to some inconsistencies (which he fails to do here by a wide margin), the fact remains that the "government need not succeed in eliminating every possible theory consistent with the defendant's innocence" because "circumstantial evidence alone may be sufficient to provide a basis for conviction." *United States v. Rodríguez–Durán*, 507 F.3d 749, 758 (1st Cir. 2007) (internal citations omitted).

The record, on its own, dispels defendant's arguments. To wit, several of the government's witnesses testified that defendant, for example: "came out through the door that I indicated. He looked out and came out with a weapon in his hand -- a black pistol that he was carrying with both his hands[;]" **ECF No. 129** at 73,[22] "[h]e came out and he pulled out half of his

---

[22] Testimony of PRPO Pacheco-Albizu on direct examination.

body through the entrance door of the residence. And at that point in time we were able to notice that he had a firearm in his hands[;]" **ECF No. 130** at 55,[23] "he looked out through the door he had a weapon in his hands[;]" **ECF No. 130** at 105.[24] The government also introduced into evidence the firearm (a black Taurus pistol) all three witnesses testified they saw him holding the day of his arrest. *See* Government's Exhibit 1. Even if defendant were successful in pointing out any inconsistencies (he is not), in ruling on a Rule 29 motion, the Court would still be called to "resolve evidentiary conflicts and credibility disputes in favor of the jury's verdict." *United States v. Valerio*, 676 F.3d at 244.

The government's evidence also pointed to the fact that defendant was also found to be in constructive possession of an AK-47 rifle and drum magazine along with another magazine with rounds of ammunition compatible with the Taurus pistols. Defendant, on the other hand, claims there was no evidence linking that rifle to him and repeats that he was arrested in another person's home and that it was Ms. Suárez who had control of the house and master bedroom where the rifle was seized from. Yet, as discussed before, defendant listed the house where he was arrested as his residence during his post-arrest booking. *See* **ECF No. 129** at 36-38. Defendant also posed such arguments to the jury during cross-examination and closing arguments. The jury's verdict demonstrates the government's witnesses were credible.

---

[23] Testimony of PRPO Marrero-Chéverez on direct examination.

[24] Testimony of PRPO Valentín-Ruiz on direct examination.

Furthermore, the government highlighted another important and substantial aspect of the evidence. Defendant was present at the house earlier that morning and also at the time of his arrest when the agents saw him out holding the black pistol. *See* **ECF No. 138** at 5. There is nothing in the record nor a contention within defendant's motions that he was not at the place the witnesses say they arrested him. Thus, even if the Court went against the jury's findings (*i.e.* that defendant also had possession of the rifle) and ran with defendant's theory that all the contraband was in his common-law wife's possession (argument presented to and rejected by the jury), the jury could have determined that defendant was in constructive possession of the weapon(s). *See United States v. Tanco-Báez*, 942 F.3d 7, 25 (1st Cir. 2019) ("[p]ossession can be either actual or constructive, sole or joint.").

Accordingly, defendant's argument has no basis since it hinges on credibility determinations that remain within the province of the jury. "The trial judge must resolve all evidentiary conflicts and credibility questions in the prosecution's favor; and, moreover, as among competing inferences, two or more of which are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt." *United States v. Olbres*, 61 F.3d 967, 970 (1st Cir. 1995) (emphasis added). "Ultimately, the court need not believe that no verdict other than a guilty verdict could sensibly be reached but must only satisfy itself that the guilty verdict finds support in a plausible rendition of the record." *United States v. Gómez*, 255 F.3d 31, 35 (1st Cir. 2001).

Defendant has provided no legal basis warranting disturbing the jury's verdict. Defendant's unsupported and undeveloped motion for judgment of acquittal at **ECF No. 137** is **DENIED**.

**IV.    Conclusion**

For all the reasons stated herein, the Court hereby **DENIES** defendant's motion for new trial at **ECF No. 136** and his motion for judgment of acquittal at **ECF No. 137.**

**SO ORDERED**.

At San Juan, Puerto Rico, on this 17th day of September 2025.


**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**